IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Palmetto State Armory, LLC, | ) | Case No. 3:23-cv-05890-JDA |
| | ) | |
| Plaintiff/Counter Defendant, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Shield Arms, LLC, | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |
| | ) | |

This matter is before the Court for claim construction in accordance with *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Specifically, the Court will construe disputed terms found in U.S. Patent Nos. 11,747,102 ("the '102 Patent"), 11,927,418 ("the '418 Patent"), 11,927,419 ("the '419 Patent"), and 12,228,363 ("the '363 Patent") (collectively, the "Asserted Patents"). The parties filed a joint claim construction statement [Doc. 37], claim construction briefs [Docs. 46; 47], responses [Docs. 50; 51], and a supplemental joint claim construction statement [Doc. 63]. The Court held a hearing on March 10, 2025. [Doc. 54] and the matter is ripe for consideration.

## BACKGROUND

In this case, Plaintiff Palmetto State Armory, LLC ("Palmetto") primarily seeks a declaratory judgment that a firearm product it has developed does not infringe on the Asserted Patents held by Defendant Shield Arms, LLC ("Shield"). [Doc. 1.] Both companies are in the business of manufacturing and selling firearms and firearm-related

products, including pistol magazines, and the Asserted Patents are generally directed to increased-capacity ammunition magazines for firearms. [*Id*. ¶¶ 9, 11–12; Doc. 46 at 2.]

At issue in this case is a 9MM 15-round magazine developed by Palmetto for its DAGGER MICRO pistol that is sold under Stock Keeping Units A05-0005-00 and A05-0002-00, which Shield claims infringes on the Asserted Patents. [Doc. 1 ¶¶ 13–14; *see* Doc. 47-3.] The Asserted Patents concern an increased capacity ammunition magazine (the "Patented Magazine"), which

> provides an increased capacity firearm ammunition magazine with a metallic body. The body is dimensioned to compatibly replace a[n] [Original Equipment Manufacturer ("OEM")] polymer or polymer over metal single stack magazine. The body has walls with exterior dimensions compatibly matching those of the OEM magazine and that are thinner than those of the OEM magazine. The thinner walls allow an at least partially laterally offset arrangement of cartridges therein. A longitudinal exterior ridge extends along a forward wall of the body and is configured from the metallic body walls and sized to compensate for forward-to-aft dimensioning difference compared to that of the OEM magazine.

[Doc. 47-3 at 8 (2:42–53).]

The parties dispute the construction of terms in claim 5 of the '102 Patent, claim 12 of the '418 Patent, claim 10 of the '419 Patent, and claim 11 of the '363 Patent. [Docs. 37-1; 63 at 3–4.]

## APPLICABLE LAW

**Claim Construction**

Before it can determine the validity of a patent, a court must construe the claims at issue, giving the claims the same meaning for purposes of both the validity and infringement

analyses.[1] *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention. Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses." (internal citations omitted)). Claim construction is a question of law and involves determining what the language of the claim means. *Markman*, 52 F.3d at 979. Courts generally use three sources to determine the meaning of the claim terms: the claims themselves, the specification, and the prosecution history— these sources are the intrinsic evidence of a claim's meaning. *Id.* A court may also consider extrinsic evidence, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles, but "[o]nly if there [is] still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584 (Fed. Cir. 1996); *see also Markman,* 52 F.3d at 980

---

[1] Claim construction is an important step in the court's analysis because "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004); *see also* 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention."); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.").

(stating that extrinsic evidence may be useful to explain scientific principles, technical terms, terms of art, and the state of the prior art at the time of the invention).

**Intrinsic Evidence**

The starting point for claim construction is the claim itself. *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999). Claim terms should usually be given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," where "the time of the invention" is usually the effective filing date of the patent application. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Further, the claim must be read and interpreted in light of the specification; "specifications and claims must harmonize. That is, [a court] may and should turn to the specifications to see what the claims really mean, and the one should not be contradictory of the other." *Acme Card Sys. Co. v. Remington-Rand Bus. Serv.,* 3 F. Supp. 254, 255 (D. Md. 1933). Moreover, as the Court of Federal Claims noted,

> The United States Court of Appeals for the Federal Circuit has recognized two circumstances where the specification is of particular importance. The first is where the specification includes a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. Specifically, a patentee can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning; the written description in such a case must clearly redefine a claim term so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term.
>
> The second is where the specification may reveal an internal disclaimer, or disavowal, of claim scope by the inventor. The import of these decisions is that the inventor's intent with respect to the claims must be clear to overcome their customary meaning.

4

*USHIP Intell. Props., LLC v. United States,* 98 Fed. Cl. 396, 406–07 (2011) (cleaned up). "However, in looking to the specification to construe claim terms, care must be taken to avoid reading limitations appearing in the specification into the claims." *Interactive Gift Exp., Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001) (cleaned up); *see also Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."). "[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed. Cir. 1998). To locate that fine line, courts must look "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention." *Id.* at 1187.

Moreover, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips,* 415 F.3d at 1317. "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995) (internal citations omitted). A patentee is precluded "from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." *Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.,* 103 F.3d 1571, 1577–78 (Fed. Cir. 1997).

5

Thus, there are three instances where a court should construe a claim term to be narrower than the ordinary and customary meaning of the words:

> (1)    If a patent specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such case, the inventor's definition will govern. However, there is a heavy presumption in favor of the ordinary meaning unless the patentee clearly has set forth an explicit definition for a claim term.
>
> (2)    If the patent specification reveals an intentional disclaimer, or disavowal, of a claim scope by the inventor. This intention must be clear and cannot draw limitations from a preferred embodiment.
>
> (3)    If a patentee has made a clear and unmistakable disavowal of scope during the prosecution of the patent. Such a disavowal is known as the doctrine of prosecution disclaimer.

*TDM Am., LLC v. United States,* 85 Fed. Cl. 774, 789 (2009) (cleaned up).

**Extrinsic Evidence**

The intrinsic evidence should usually be sufficient for determining the meaning of a claim term. *See Markman,* 52 F.3d at 986 (citing the disclosure requirements of 35 U.S.C. § 112 and noting that "ideally there should be no 'ambiguity' in claim language to one of ordinary skill in the art that would require resort to evidence outside the specification and prosecution history"). However, when needed and in its discretion, a court may consider extrinsic evidence to determine the meaning of the language employed in the patent. *Id.* at 980; *see also Vitronics,* 90 F.3d at 1583 (stating that, when the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence for purposes of claim construction). "While extrinsic evidence may be useful in shedding light on the relevant art, it is less significant than the intrinsic record in determining the legally operative meaning of

disputed claim language."[2] *Bushnell, Inc. v. Brunton Co.,* 673 F. Supp. 2d 1241, 1251 (D. Kan. 2009) (internal quotation marks omitted)

Dictionaries, which are a form of extrinsic evidence, hold a special place and may sometimes be considered along with the intrinsic evidence. *Vitronics,* 90 F.3d at 1584 n.6 (stating that, although technically extrinsic evidence, the court is free to consult dictionaries at any time to help determine the meaning of claim terms, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents"). Accordingly, a court may utilize extrinsic evidence such as dictionary definitions to determine a claim's meaning as long as the extrinsic evidence does not contradict the patent documents.

## DISCUSSION

**Person of Ordinary Skill in the Art**

As noted, patent claims are to be construed to reflect the understanding of a person of ordinary skill in the art ("POSA") at the time of the invention. *See Phillips*, 415 F.3d at

---

[2] The rationale for this rule is that

> [t]he claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence . . ., such as expert testimony, would make this right meaningless. The same holds true whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims.

*Vitronics*, 90 F.3d at 1583 (citations omitted).

1313.  Thus, it is important to first identify and understand the requisite level of ordinary skill in the relevant art.

Here, the parties have submitted expert declarations and reports with opinions in support of their positions and, although their definitions are substantially similar, they disagree as to the specific definition of a POSA in this case.  According to Palmetto's expert, David Byron, a POSA "would have a substantial level of experience in handling, operating, and understanding various types of firearms, including knowledge of ballistics, mechanics, safety procedures, and relevant regulations, typically gained through a combination of formal training, practical experience as a firearms instructor, law enforcement officer, military personnel, or a career in the firearms industry."  [Doc. 47-13 ¶ 22.]  Shield's expert, Stephen Batzer, PhD., posits that a POSA would be "someone who had a bachelor's degree in mechanical engineering or equivalent training in firearms and munitions, and at least two years of experience working with firearms and munitions.  Additional work experience can substitute for specific educational background, and vice versa."  [Doc. 46-1 ¶ 30.]

The Court notes that these two definitions are substantially similar, and neither party has given reason why their differences are dispositive or critical to the resolution of any specific issue in this case.  The Court concludes that Palmetto's definition of the POSA is more appropriate to the claims at issue and adopts it for purposes of this Order.

**Disputed Terms**

The parties dispute a number of terms in claims 5 of the '102 Patent, 12 of the '418 Patent, 10 of the '419 Patent, and 11 of the '363 Patent.  The Court will address each term below.[3]

### *"Single stack" and "staggered" [terms 1 & 2]*

The parties first ask the Court to construe the claim terms "single stack . . .magazine" and "staggered arrangment," each of which describes different arrangements of cartridges in a magazine.  [Doc. 37-1 at 2.]

Shield contends that "single stack . . . magazine" is properly construed as "a magazine that holds rimless cartridges substantially parallel to one another in a single row." [*Id*. (internal quotation marks omitted).]  Palmetto, on the other hand, defines the term as "a magazine that holds cartridges in a single vertical alignment with no horizontal offset." [*Id*. (internal quotation marks omitted).]

In support of its construction, Shield argues that its proposed construction is consistent with the customary and ordinary meaning of the term, and that a POSA would recognize this definition to be that of a single stack firearm magazine.  [Doc. 46 at 11–12.] Palmetto contends that Shield's construction does not adequately define the scope of "single stack" because the term as used in the specification[4] is not limited to "rimless cartridges," nor does it require the rounds to be "substantially parallel." [Doc. 47 at 23–25.]

---

[3] Because many of the disputed terms appear in multiple claims and in multiple patents, the Court will reference the disputed terms by term number as listed in the parties' joint claim construction chart and supplement.  [*See* Docs. 37-1; 63 at 3–4.]

[4] Unless otherwise noted, any reference to the "specification" will refer to the specification of the '102 Patent [*see* Doc. 47-3].

Palmetto further argues that the specification differentiates "single stack" magazines from magazines that hold cartridges in "only slightly staggered rows," and that this distinction suggests that cartridges in a "single stack" arrangement are not staggered in any way. [*Id.* at 24–25 (citing Doc. 47-3 at 8 (2:9–11)).]

In contrast, Shield defines "staggered arrangement" as "arranged in an alternating offset or zigzagged pattern or position." [Doc. 37-1 at 2 (internal quotation marks omitted).] Palmetto contends the term is properly construed as "[n]ot a single vertical alignment with at least a partial horizontal offset." [*Id.* (internal quotation marks omitted).]

In support of Shield's construction, Dr. Batzer opines that the term "staggered arrangement" is "well described by the expression 'zigzagged pattern' which efficiently and intuitively describes the left-right-left-right- . . . nature of the two partially overlapping columns of rimless cartridges." [Doc. 46-1 ¶ 40 (alteration in original).] Palmetto contends that the term should be more specifically described as "not a single vertical alignment with at least a partial offset," to differentiate it from a "single stack." [Doc. 47 at 26 (internal quotation marks omitted).] Palmetto notes that the specification describes different types of "staggered arrangements" varying in degree, and that all include at least a partial horizontal offset. [*Id.*]

For the reasons discussed below, upon considering the language of the specification and claims, as well as the opinions of the parties' experts as to what a POSA would understand the terms to mean, the Court construes the terms as follows:

| Term Number | Claim Element | Palmetto's Proposed Construction | Shield's Proposed Construction | The Court's Construction |
|---|---|---|---|---|
| 1 | "single stack . . . magazine" | "a magazine that holds cartridges in a single vertical alignment with no horizontal offset" | "a magazine that holds rimless cartridges substantially parallel to one another in a single row" | "a magazine that holds cartridges in a single vertical alignment substantially parallel to one another in a single row" |
| 2 | "staggered arrangement" | "not a single vertical alignment with at least a partial horizontal offset" | "arranged in an alternating offset or zigzagged pattern or position" | "a laterally offset row of cartridges each situated substantially parallel to each other" |

The Court's construction of each term is consistent with the language of the specification. The specification describes a "single stack" magazine as holding cartridges "substantially parallel to one another in a single row." [Doc. 47-3 at 8 (1:43–44).] It further explains that magazine designs known as "double stack" magazines hold cartridges "substantially parallel to each other in an alternating double column." [*Id.* (1:45–48).] Although the specification indicates that *some* handgun magazines hold rimless cartridges [*id.* (1:43–45)], nothing in the language of the claim terms or specification requires the Patented Magazine to be *limited* to "rimless cartridges," and the Court therefore declines to include this limitation in the construction of the term. Additionally, "staggered arrangement" is expressly described in the specification as a "laterally offset row of cartridges, each situated substantially parallel to each other." [*Id.* at 9 (4:18–20).] The Court concludes that the language of the specification appropriately defines this term and adopts this construction.

11

### *"Spacer" [terms 4 & 5]*

The Court next looks at the term "spacer," which appears in multiple claims in similar language.  Claim 5 of the '102 Patent, where the term first appears, includes language regarding "the forward wall having a longitudinally extending spacer projecting outwardly therefrom."  [*Id*. at 10 (6:31–32).]  Claims 12 of the '418 Patent and 10 of the '419 Patent include similar language: "at least one longitudinally extending spacer on the forward wall projecting forwardly therefrom."  [Docs. 47-4 at 11 (7:36–37); 47-5 at 11 (7:5–6).]  Palmetto contends this term is properly construed in both phrases as "the metallic forward wall having a metallic longitudinally extending spacer formed in the metallic forward wall and projecting outwardly therefrom."  [Doc. 47 at 29–32 (internal quotation marks omitted).]  Shield argues both phrases are properly construed, with slight variation, as "a forward wall with a spacer that has a longitudinal dimension and that extends outwardly from the forward wall." [Doc. 46 at 17–19.]

In support of its construction, Palmetto argues that "[t]he specification, prosecution history, and claim language make clear that the 'longitudinally extending space' is metallic and is formed in the front wall of the metallic body of the magazine."  [Doc. 47 at 29.]  Shield contends that "[t]he term 'spacer' is not disclosed as necessarily being constructed from any particular material" and that such qualifying language could have been used based on other claim elements being narrowly tailored in this way, such as the claimed "metallic tubular body," but that Shield chose not to define "spacer" by its material.  [Doc. 46 at 17.]  Shield further argues that, with respect to the '102 Patent, the claim element requires a "forward wall *having* a longitudinally extending spacer projecting outwardly therefrom," with

no explicit requirement that the longitudinally extending spacer be made of the same material as the metallic tubular body. [*Id*. at 18.]

For the reasons discussed below, upon considering the language of the specification and claims, as well as the opinions of the parties' experts as to what a POSA would understand the terms to mean, the Court construes the terms as follows:

| Term Number | Claim Element | Palmetto's Proposed Construction | Shield's Proposed Construction | The Court's Construction |
|---|---|---|---|---|
| 4 | "the forward wall having a longitudinally extending spacer projecting outwardly therefrom" | "the metallic forward wall having a metallic longitudinally extending spacer formed in the metallic forward wall and projecting outwardly therefrom" | "a forward wall with a spacer that has a longitudinal dimension and that extends outwardly from the forward wall" | "the metallic forward wall having a longitudinally extending spacer formed in the metallic forward wall and projecting outwardly therefrom" |
| 5 | "at least one longitudinally extending spacer on the forward wall projecting forwardly therefrom" | "the metallic forward wall having a metallic longitudinally extending spacer formed in the metallic forward wall and projecting outwardly therefrom" | "a forward wall that has on it a spacer that has a longitudinal dimension and that extends outwardly from the forward wall" | "at least one longitudinally extending spacer formed on the metallic forward wall projecting forwardly therefrom" |

In construing the term, the Court first notes that the specification of the '102 Patent explains that the Patented Magazine has "reduced-thickness metallic body walls" and a "longitudinal ridge [] formed in the metallic forward wall of the magazine tube so that the interior surfaces that contact ammunition cartridges remains unchanged and the space is compensated for without using any significant amount of additional material." [Doc. 47-3

at 8 (2:31–32, 37–41).] The specification also explains that, according to one embodiment of the Patented Magazine, a ridge is formed in the forward wall of the metallic body and the ridge can be stamped or roll formed into the metal as it is formed into the shape of the body. [*Id*. at 10 (5:13–18).] The specification does not disclose any embodiments in which the longitudinal ridge or spacer is formed of a separate material or is not formed into the metallic forward wall, and it signifies the benefits of the spacer being formed in or from the metallic body to avoid the use of any significant amount of additional material. [*Id*. at 8 (2:37–41).]

The Court therefore concludes that the focus of the Asserted Patents is to offer a metal magazine as a replacement for a polymer or polymer-over-metal magazine by creating a ridge (or "spacer," as used in the claims) formed in and projecting from the metal front wall to take up the additional space created by using thinner metal walls without using additional materials that add complexity, cost, and weight. [*See id*. at 8 (2:15–27, 31–53).] Further, during prosecution, Shield distinguished the Patented Magazine over prior art magazines by representing that the Patented Magazine disclosed a longitudinal exterior ridge that is "configured from the metallic body walls." [Doc. 47-6 at 98 (internal quotation marks omitted).]

### ***"Edge" [terms 12–15, 21]***

The Court next turns to several terms that turn on construction of the word "edge," including:

> <u>Term 12</u>: "an edge in the first side wall or the second opposite side wall";
>
> <u>Term 13</u>: "at least one of the first and second side walls having an edge";
>
> <u>Term 14</u>: "an edge on at least one of the first and second side walls";
>
> <u>Term 15</u>: "an edge . . . configured to interact with a magazine catch of a polymer frame pistol"; and

Term 21: "an edge extending laterally outwardly from at least one of the sidewall." [Docs. 37-1 at 5 (internal quotation marks omitted); 63 at 3 (internal quotation marks omitted).]

Palmetto contends that proper construction of the first four terms is "an edge formed in one of the metallic side walls that is configured to directly engage a magazine catch of a polymer frame pistol." [Doc. 37-1 at 5 (internal quotation marks omitted).] It further argues that term 21 should be construed as "an edge formed in and extending laterally outwardly from at least one of the sidewalls." [Doc. 63 at 3 (internal quotation marks omitted).] Shield, on the other hand, contends that the first three terms should be defined, with slight variation, as "the border of a surface associated with the first side wall or the second opposite side wall." [Doc. 37-1 at 5 (internal quotation marks omitted).] The fourth, it contends, should be defined as "the border of a surface made to work with a magazine catch of a polymer frame pistol," and the fifth should be "a border of a surface stretched in a lateral direction from at least one of the sidewalls." [*Id*. (internal quotation marks omitted); Doc. 63 at 3 (internal quotation marks omitted).]

With respect to the first four terms, Palmetto explains that the parties' primary dispute is similar to that of the term "spacer," i.e., whether the edge must be formed in the metallic side wall or whether the edge may be formed in a separate component that is attached to the side wall. [Doc. 47 at 37.] It contends that "the whole point of the Asserted Patents is to provide a metal magazine as a replacement for polymer or polymer-over-metal magazines, and form a ridge in the metal front wall to take up the additional space created by using thinner metal walls without using additional materials that add complexity, cost, and weight." [*Id*. (citing 47-3 at 8 (2:15–27, 31–53)).] In the supplemental joint claim

15

construction statement, Palmetto notes that the dispute regarding the term "edge" in the '363 Patent is largely the same as with the other relevant patents, and that "there is absolutely no support in the specification or prosecution histories of the Asserted Patents for an 'edge' that is not formed in the metal sidewall of the magazine."  [Doc. 63 at 4.]

Shield, on the other hand, argues that "[a]n edge is a common design feature" and that the claim element language is general and does not describe the configuration of the included edge.  [Doc. 46 at 28–29.]  Shield's expert, Dr. Batzer, references the dictionary definition and an engineer's general understanding of the term in opining that an "edge" is simply a border of two intersecting surfaces.  [Doc. 46-1 ¶ 78.]  Dr. Batzer also points out "minor yet important distinctions" in how the term "edge" is related to the side wall(s), such as "in" versus "having" versus "on."  [*Id*. ¶¶ 79–81.]  With respect to term 21, Shield relies on its prior arguments and contends that Palmetto "is continuing to read an improper level of specificity into general claim language."  [Doc. 63 at 7.]

For the reasons discussed below, upon considering the language of the specification and claims, as well as the opinions of the parties' experts as to what a POSA would understand the terms to mean, the Court construes the terms as follows:

| Term Number | Claim Element | Palmetto's Proposed Construction | Shield's Proposed Construction | The Court's Construction |
|---|---|---|---|---|
| 12 | "an edge in the first side wall or the second opposite side wall" | "an edge formed in one of the metallic side walls that is configured to directly engage a magazine catch of a polymer frame pistol" | "the border of a surface associated with the first side wall or the second opposite side wall" | "an edge formed in one of the metallic side walls configured to interact with a magazine catch of a polymer frame pistol" |

| 13 | "at least one of the first and second side walls having an edge" | "an edge formed in one of the metallic side walls that is configured to directly engage a magazine catch of a polymer frame pistol" | "the border of a surface positioned on at least one of the first and second side walls" | "an edge formed in at least one of the metallic side walls configured to interact with a magazine catch of a polymer frame pistol" |
| 14 | "an edge on at least one of the first and second side walls" | "an edge formed in one of the metallic side walls that is configured to directly engage a magazine catch of a polymer frame pistol" | "the border of a surface positioned on at least one of the first and second side walls" | "an edge formed in at least one of the metallic side walls configured to interact with a magazine catch of a polymer frame pistol" |
| 15 | "an edge . . . configured to interact with a magazine catch of a polymer frame pistol" | "an edge formed in one of the metallic side walls that is configured to directly engage a magazine catch of a polymer frame pistol" | "the border of a surface made to work with a magazine catch of a polymer frame pistol" | "an edge formed in one of the metallic side walls configured to interact with a magazine catch of a polymer frame pistol" |
| 21 | "an edge extending laterally outwardly from at least one of the sidewall" | "an edge formed in and extending laterally outwardly from at least one of the sidewalls" | "a border of a surface stretched in a lateral direction from at least one of the sidewalls" | "an edge formed in one of the metallic side walls configured to interact with a magazine catch of a polymer frame pistol" |

The Court first notes that the term "edge" is not used in the specification of the Asserted Patents. The specification mentions a "cut-out," explaining that according to one aspect of an embodiment, the sheet metal magazine body "may include one or more cut-outs that allow the magazine to be retained by a magazine catch (not shown) in the magazine well of the firearm." [Doc. 47-3 at 9 (3:63–4:4).] In the Court's view, the "edge"

17

described in the claims performs the same function as the "cut-out" described in the specification.  While the edge is described in the claims as "in" or "on" a side wall, the specification clarifies that a "cut-out" is *included in* the body of the magazine and allows the magazine to be retained by a magazine catch in the magazine well of the firearm.  [*Id*. (4:1–4).]  Thus, the edge cannot be formed in just any surface but must be formed in the metallic side wall.  Shield's construction defining the edge as a "border of a surface" does not appear to have any support in the specification, claim language, or prosecution history, and is too broad to add clarity to the meaning of the term.

### *"First exterior/external dimensions" [terms 16 & 17]*

Palmetto contends that the next two disputed terms, concerning "external dimension" and "exterior dimension," should be given their plain and ordinary meaning. [Doc. 37-1 at 5–6.]  Shield, on the other hand, defines term 16 as "an external dimension relating to the metallic tubular body measured by the distance from the forwardmost surface of the longitudinally extending spacer to the rearmost surface of the rearward wall" and "an exterior dimension measured by the distance between the forwardmost surface of the spacer and the rearward wall."  [*Id*. at 5 (internal quotation marks omitted).]  Shield defines term 17 as "an exterior dimension measured by the distance between the forwardmost surface of the space and the rearward wall."  [*Id*. at 6 (internal quotation marks omitted).]

Palmetto argues that neither term requires construction because "[t]he plain language of the claim clearly identifies the dimension it is referring to" and Shield's construction adds unnecessary words and complexity to the terms.  [Doc. 47 at 38–39.]  As to the term involving "external dimension," Dr. Batzer opines that Shield's proposed construction better captures the meaning of the claim element based on the context

provided in the '102 Patent and its prosecution history. [Doc. 46-1 ¶ 86.] Specifically, the word "of" used in the claim phrase "a first external dimension *of* the metallic tubular body" means "relating to" or "in respect to" but does not require that the spacer be formed *in* the forward wall. [*Id.* (internal quotation marks omitted)]. As to the "exterior dimension" term, Dr. Batzer explains that both parties' constructions are correct, as Shield's construction merely restates the claim element using synonyms. [*Id.* ¶ 89.]

For the reasons discussed below, upon considering the language of the specification and claims, as well as the opinions of the parties' experts as to what a POSA would understand the terms to mean, the Court construes the terms as follows:

| Term Number | Claim Element | Palmetto's Proposed Construction | Shield's Proposed Construction | The Court's Construction |
|---|---|---|---|---|
| 16 | "a first external dimension of the metallic tubular body from the forwardmost surface of the longitudinally extending spacer to the rearmost surface of the rearward wall" | Plain and ordinary meaning | "an external dimension relating to the metallic tubular body measured by the distance from the forwardmost surface of the longitudinally extending spacer to the rearmost surface of the rearward wall" | "an external dimension relating to the metallic tubular body measured by the distance from the forwardmost surface of the longitudinally extending spacer to the rearmost surface of the rearward wall" |
| 17 | "a first exterior dimension between the forwardmost surface of the spacer and the rearward wall" | Plain and ordinary meaning | "an exterior dimension measured by the distance between the forwardmost surface of the spacer and the rearward wall" | "an exterior dimension measured by the distance between the forwardmost surface of the spacer and the rearward wall" |

The Federal Circuit has made clear that when the claim term is disputed and reliance on the ordinary meaning will not resolve the parties' dispute, "it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008). In such a circumstance, simply declaring that the claim "needs no construction" or has the "plain and ordinary meaning" is not enough. *Id.* at 1361 (internal quotation marks omitted). The Court concludes that the claim language itself sums up the meaning of these claim phrases, and that Shield's proposed constructions properly reflect the plain and ordinary meaning of the claim terms.

### *"Removable closure member" [terms 18–20]*

The next three disputed phrases all depend on construction of the term "removable closure member." Palmetto contends that the phrase "a metallic tubular body defining a hollow interior having . . . a bottom removable closure member" is properly construed as "a metallic tubular body defining a hollow interior having . . . a metallic bottom removable closure member" and that the similar phrases in the '418 Patent and the '419 Patent should be given their plain and ordinary meaning. [Doc. 37-1 at 6 (internal quotation marks omitted).] Shield, on the other hand, contends that the phrases should be construed, with slight variation, as "a tubular body made of metal that defines a hollow interior and that includes a bottom closure member that is removable." [*Id.* (internal quotation marks omitted)]

As with many of the disputed terms already discussed, the primary difference in the parties' constructions of "removable closure member" is the "metallic" descriptor. Palmetto argues that "[t]he plain language of claim 5 of the '102 Patent indicates that the 'bottom removable closure member' is part of the 'metallic tubular body,' and is therefore also made

of metal." [Doc. 47 at 39 (internal quotation marks omitted); *see* Doc 47-13 ¶ 86.] Palmetto further contends that terms 19 and 20 do not "require[] construction because a POSA would readily understand the meaning of both terms" and that "Shield's construction slightly rearranges the same words of the claim in a way that is not helpful to the Court." [Doc. 47 at 40.]

Shield's expert, Dr. Batzer, opines that "there is no requirement that the bottom removable closure member be made of the same material as the metallic tubular body." [Doc. 46-1 ¶ 92.] He further explains that "any [POSA] having the requisite familiarity with firearms would understand that firearm magazines, even metallic magazines, typically include a bottom removable closure member made of a polymer—not a metal as suggested in [Palmetto]'s proposed construction." [*Id*.] With respect to terms 19 and 20, Dr. Batzer opines that Shield's construction provides clarity to the claim language and that "the commas in [these claim elements] separate the definitions of claim elements, syntactically clarifying that the material of the bottom removable closure member does not need to be the same as the metallic tubular body, as the metallic tubular body and the bottom removable closure members are different elements of the magazine assembly." [*Id*. ¶ 93.]

For the reasons discussed below, upon considering the language of the specification and claims, as well as the opinions of the parties' experts as to what a POSA would understand the terms to mean, the Court construes the terms as follows:

| Term Number | Claim Element | Palmetto's Proposed Construction | Shield's Proposed Construction | The Court's Construction |
|---|---|---|---|---|
| 18 | "a metallic tubular body defining a hollow interior | "a metallic tubular body defining a hollow interior | "a tubular body made of metal that defines a hollow interior and that | "a metallic tubular body defining a hollow interior |

|  | "having . . . a bottom removable closure member" | "having . . . a metallic bottom removable closure member" | includes a bottom closure member that is removable" | "having … a bottom removable closure member" |
|---|---|---|---|---|
| 19 | "a metallic tubular body . . . having . . . an open bottom, a removable closure member enclosing the open bottom of the body" | Plain and ordinary meaning | "a tubular body made of metal with an open bottom, and a closure member that encloses the open bottom of the body and that is removable" | "a metallic tubular body . . . having . . . an open bottom, a removable closure member enclosing the open bottom of the body" |
| 20 | "a metallic tubular body . . . having . . . an open bottom, . . . a removable closure member for enclosing the open bottom of the body" | Plain and ordinary meaning | "a tubular body made of metal with an open bottom, and a closure member that encloses the open bottom of the body and that is removable" | "a metallic tubular body . . . having . . . an open bottom, . . . a removable closure member for enclosing the open bottom of the body" |

The specification provides that a bottom end of the tubular body of the magazine is typically closed by a removeable floor plate that retains the spring for pushing the cartridges upward and provides an end against which the springs bears. [Doc. 47-3 at 8 (1:20–29).] The specification also provides that a bottom end of the body is open and accepts attachment of a base pad or other removable closure member. [*Id*. at 9 (3:61–63).] Nothing in the specification indicates that the *bottom* end must be made of specific material, only that, if desired, the bottom end of the body could be shaped to mimic that of the OEM polymer or polymer over metal magazine so that an OEM base plate or extension could be

used. [*Id.* at 10 (5:32–35).] Thus, the Court concludes that the claim language itself sums up the meaning of these claim phrases and no further construction is necessary.

**Indefinite Terms**

The Court next turns to several terms that Palmetto claims are indefinite.[5] In an indefiniteness analysis, the Court must determine whether the term at issue, when "read in light of the specification delineating the patent . . . fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 901 (2014).

### *"Polymer frame pistol" and "single stack polymer or polymer-over-metal magazine" [terms 3, 7–9, 22–23]*

Palmetto argues that claim terms referring to certain dimensions or aspects of the "polymer frame pistol" and "single stack polymer or polymer-over-metal magazine" are indefinite "because they fail to identify a specific make or model of the recited pistol and magazine, and therefore a [POSA] would not be able to determine the scope of claim with a reasonable degree of certainty." [Docs. 47 at 27; 63 at 5–6.] Palmetto references the prosecution of the '102 Patent, explaining that the Examiner "immediately identified the same issue" when he noted that the "'specific type of firearm must be provided in the claim, and dependent upon the firearm, the dimensions of the OEM magazine must be indicated

---

[5] The parties refer to 35 U.S.C. § 112, ¶ 2 (2006) in their indefiniteness arguments, but that paragraph was replaced by § 112(b) when the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011), took effect on September 16, 2012. Because the applications resulting in the patents at issue were filed after that date [Docs. 1-1 at 2; 55-1 at 2; 55-2 at 2; 55-3 at 2], the reference to § 112, ¶ 2 is incorrect, and the Court therefore does not include it.

to provide [] clear metes and bounds for the claims.'" [Doc. 47 at 27 (alteration in original) (citing Doc. 47-6 at 116).]

Palmetto's expert, Mr. Byron, opines that "a POSA would not understand the scope of the term 'a polymer frame pistol configured to accommodate a single stack polymer or polymer-over-metal magazine' with a reasonable degree of certainty because not all single stack polymer or polymer-over-metal are the same size." [Doc. 47-13 ¶ 65.] Mr. Byron explains that he analyzed factory supplied pistol magazines for 16 different makes and models of current 9x19 caliber polymer grip frame pistols and learned that "not all polymer frame pistols that are configured to accommodate single stack polymer or polymer-over-metal magazines are sized to accept the same sized magazines." [*Id.* ¶ 75; *see id.* ¶¶ 66–68, 76.]

In contrast, Shield's expert, Dr. Batzer, opines that Shield's construction of these terms matches the plain and ordinary meaning of the claim elements. [Doc. 46-1 ¶ 44.] He explains that a POSA "would be immediately aware of what is meant by the claim element" without reference to the patents in dispute because a POSA would understand from his experience with handgun magazines that it would be possible to redesign the extended magazine to incorporate a polymer spacer such that the bottom closure would be adjacent to the bottom of the handgun grip. [*Id.* ¶¶ 45, 58, 63, 67.] Dr. Batzer further explains,

> The scope of the relevant magazines for the patents in dispute is quite narrow, only "reading onto" pistol magazines that can be used in a pistol that was set up to be able to use a single stack polymer over metal magazine (e.g., the Glock 43, the Glock 43X, etc.). This fact and the plain meaning of the patents' specifications diminish the plausibility of any Palmetto argument that individual [c]laim [t]erms are "indefinite" since the claim terms are contextually clear.

24

[*Id*. ¶ 45.]

For the reasons discussed below, upon considering the language of the specification and claims, as well as the opinions of the parties' experts as to what a POSA would understand the terms to mean, the Court concludes the following:

| Term Number | Claim Element | Palmetto's Proposed Construction | Shield's Proposed Construction | The Court's Construction |
|---|---|---|---|---|
| 3 | "a polymer frame pistol configured to accommodate a single stack polymer or polymer-over-metal magazine" | Indefinite | "a polymer frame pistol that is [set up to be] able to use a single stack polymer or polymer-over-metal magazine" | Indefinite |
| 7 | "a height dimension configured to fit within a handgrip of the polymer frame pistol with the bottom removable closure member configured to be located directly adjacent to the bottom of the handgrip when the magazine is inserted into the handgrip of the polymer frame pistol" | Indefinite | "a height dimension sized and shaped to fit into the interior of a handgrip of the polymer frame pistol so that the bottom removable closure member will be next to the bottom of the handgrip when the magazine is inserted into the handgrip of the polymer frame pistol" | Indefinite |
| 8 | "a height dimension configured to fit within a handgrip of the polymer frame pistol and locate the | Indefinite | "a height dimension sized and shaped to fit into the interior of a | Indefinite |

| | | | |
|---|---|---|---|
| | removable closure member directly adjacent to the bottom of the handgrip when the magazine is inserted into the handgrip of the polymer frame pistol" | | handgrip of the polymer frame pistol and position the removable closure member next to the bottom of the handgrip when the magazine is inserted into the handgrip of the polymer frame pistol" | |
| 9 | "a first [external/exterior] dimension…[and]…a second [exterior/external] dimension…[to match/matching] the corresponding exterior dimension of the single stack polymer or polymer-overmetal magazine" | Indefinite | "a first [external/exterior] dimension … [and] a second [external/exterior] dimension relating to the metallic tubular body … each sized to fit the same as the corresponding exterior dimension of the single stack polymer or polymer-overmetal magazine" | Indefinite |
| 22 | "an edge . . . configured to interact with a magazine catch of a polymer frame pistol that accommodates a single stack polymer or polymer over metal magazine" | Indefinite | "a border of a surface designed to interact with a magazine catch of a polymer frame pistol able to accept a single stack polymer or polymer over metal magazine" | Indefinite |
| 23 | "locate an uppermost edge of the removable | Indefinite | "position an uppermost border of a surface of the | Indefinite |

| | closure member directly adjacent to a lowermost edge of the handgrip when the magazine is inserted into the handgrip" | | removable closure member next to, without intervention, a lowermost border of a surface of the handgrip when the magazine is inserted into the handgrip" | |
|---|---|---|---|---|

Looking first to the specification, the Court notes that although the illustrated magazine is dimensioned for a Glock 43X handgun, which holds 15 rounds and 9x19 mm cartridges, the specification provides that the Patented Magazine "may be adapted to provide increased ammunition capacity replacing a single stack or slightly staggered row polymer magazine for *most any* caliber or model."  [Doc. 47-3 at 9 (4:14–17) (emphasis added).]  The specification also explains that the Patented Magazine "provides increased capacity with a width dimension identical to that of the prior art single stack (or slightly staggered) magazine by utilizing thinner metallic walls that correspond to the exterior dimension of the lower-capacity magazine it replaces."  [*Id.* at 9–10 (4:64–5:2).]  Thus, instead of specifying the model of the polymer frame pistol or the number of cartridges to be held, the specification creates an overbroad scope of claim without a clear reference point.

Additionally, the prosecution history reveals that original claims 1 and 2 of the '102 Patent (containing the terms at issue) were rejected by the Examiner in a Non-Final Office Action on April 20, 2021, as indefinite because they "require[d] comparisons between a claimed magazine and an OEM . . . magazine made from polymer or polymer over metal," but "the claims fail[ed] to provide specific dimensions for the OEM magazine to form the

basis for comparison." [Doc. 47-6 at 115.] The Examiner further noted that "there are numerous firearms having a wide variety of magazines" and that a POSA "could not make such comparisons without first knowing the dimensions of the OEM magazine." [*Id*. at 115–16.] The Examiner required that "the specific type of firearm must be provided in the claim, and dependent upon the firearm, the dimensions of the OEM magazine must be indicated to provide [] clear metes and bounds for the claims."[6] [*Id*. at 116.]

On November 22, 2022, the Examiner raised the same issues in another Non-Final Office Action, rejecting claims 1–7 as indefinite because the claims recited an increased cartridge capacity but did not provide sufficient detail to compare the capacity of the OEM magazines that the Patented Magazine is intended to replace. [*Id*. at 49–50.] The Examiner explained that the claims made "comparisons to an imaginary unknown existing magazine without providing sufficient detail about the existing magazine to form an appropriate basis so that the necessary comparisons [could] be determined." [*Id*. at 49.] The Examiner noted that a POSA would need to make a separate infringement determination for every size and shape of magazine and that based on the specification, the determinations "would likely result in non-infringing outcomes unless the magazine happened to have certain dimensions." [*Id*. at 49–50.]

On April 10, 2023, Shield amended the claims to specify that the Patented Magazine is a replacement magazine for a Glock polymer or polymer over metal single stack magazine and argued that because the claims were amended to specify a replacement for a Glock single stack, polymer or polymer over metal magazine, the claims were no longer

---

[6] On October 13, 2021, the Examiner issued a Final Office Action withdrawing the prior indefiniteness and obviousness rejections and raising a new rejection that the claims were anticipated by U.S. Patent No. 7,937,872 issued to Fluhr. [*Id*. at 103.]

indefinite. [*Id*. at 29, 41–43.] On July 19, 2023, the Examiner issued a Notice of Allowance cancelling all of the previously amended claims and adding new claims that did not specify that the Patented Magazine was a replacement for a Glock magazine nor identify any other make or model of OEM magazine for which the Patented Magazine is a replacement. [*Id*. at 9–13.]

Considering all of this evidence, the Court concludes that these terms are indefinite as written. Specifically, the Court agrees with the Examiner's original rejection of these claims in the '102 Patent prosecution and does not see how the current claim language resolves the Examiner's indefiniteness concerns. Although it is unclear why the Examiner issued the claims without the limitation he previously determined was necessary for issuance, it is evident from the prosecution history that Shield's proposed amendment specifying that the Patented Magazine is a replacement for a Glock is necessary to establish the metes and bounds of the invention and to avoid prior art references. *See TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ("[I]n ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest. Such acquiescence may be found where the patentee narrows his or her claims by amendment."). Moreover, the Examiner's rejections put Shield on notice that the claims must identify the dimensions of the OEM magazine because, otherwise, a POSA would need to make a separate infringement determination for every size and shape of magazine—a requirement that is beyond the disclosure of the specification of the '102 Patent. [*See* Doc. 47-6 at 49.] The lack of specificity regarding the type of polymer frame pistol and magazine dimensions leaves a POSA unable to

determine whether a given magazine is within the scope of the claims, and thus the Court concludes that the terms at issue are indefinite. *See Biosig Instruments, Inc. v. Nautilus*, 783 F.3d 1374, 1377 (Fed. Cir. 2015) ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them. Otherwise there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." (cleaned up)).

### "*Internal/interior dimensions*" *[terms 6, 10–11]*

Palmetto similarly contends that certain terms regarding the "internal dimension" and "interior dimension" are indefinite because the internal/interior dimensions of the magazine depend on the extent to which the cartridges in the magazine are staggered and the size of the caliber cartridge, which are undefined. [Doc. 47 at 32–33, 35–36.]

Palmetto's expert, Mr. Byron, explains that the first claim term "attempts to define the internal width of the magazine between the two side walls, but does so by saying the width is dimensioned to fit 9x19 mm cartridges with a staggered arrangement of the cartridges. But the width needed to accommodate a staggered arrangement of cartridges will depend on how staggered the cartridges are." [Doc. 47-13 ¶ 74; *see id*. ¶ 79 (same issue as to term 11).] He further opines as to the other claim terms "that a POSA would not be able to determine the scope of [the terms] because the claimed interior dimension is based on a 'selected caliber of cartridge,'" and "the Asserted Patents' specification does not explain how such a caliber selection would be performed." [*Id*. ¶ 77; *see id*. ¶ 78.]

In response, Shield's expert, Dr. Batzer, opines that Palmetto's indefiniteness claims as to terms 6 and 11 fail because "all conventional handgun box magazines, for example, those as illustrated within the preferred instantiation of the [Patented Magazine], are

dimensioned to fit the cartridges of interest and *it cannot be otherwise*."  [Doc. 46-1 ¶¶ 55, 75.]  He opines that any POSA would realize "that the actual internal dimension which separates the two side walls will be determined by routine design techniques and prototype validation" and that "it is not typical to include the magnitude of this dimension . . . unless there is a particular novel aspect being disclosed."  [*Id*. ¶¶ 55, 75.]  The only difference between term 6 and term 11, he explains, is that term 6 covers only magazines using 9x19 mm cartridges, while term 11 is not limited to magazines using 9x19 mm cartridges.  [*Id*. ¶ 74.]  With respect to term 10, he similarly opines that it is not indefinite because "all magazines are dimensioned in each of the three cardinal dimensions . . . to suit their selected caliber of cartridge."  [*Id*. ¶ 72.]

     For the reasons discussed below, upon considering the language of the specification and claims, as well as the opinions of the parties' experts as to what a POSA would understand the terms to mean, the Court concludes the following:

| Term Number | Claim Element | Palmetto's Proposed Construction | Shield's Proposed Construction | The Court's Construction |
|---|---|---|---|---|
| 6 | "a second internal dimension between the first side wall and the second [opposite] side wall dimensioned to fit 9x19 mm cartridges with a staggered arrangement of the cartridges" | Indefinite | "an internal dimension measured by the distance separating the first side wall and the second [opposite] side wall, that dimension sized to fit nominal 9x19 mm cartridges, inclusive of 9mm Luger and 9mm Parabellum, arranged in an alternating offset or zigzagged pattern or position" | Indefinite |
| 10 | "a first interior dimension between the forward wall and the rearward wall dimensioned to fit a selected caliber of cartridge" | Indefinite | "an interior dimension measured between the forward wall and the rearward wall and sized to fit a selected caliber of cartridge" | Indefinite |
| 11 | "a second internal dimension between the first side wall and the second side wall dimensioned to fit the selected caliber of cartridge | Indefinite | "an interior dimension measured between the first side wall and the second side wall sized to fit the selected caliber of cartridge | Indefinite |

| | with a staggered arrangement of the cartridges" | | arranged in an alternating offset or zigzagged pattern or position" | |
| --- | --- | --- | --- | --- |

First, the only language in the specification relevant to the internal/interior dimensions provides that the Patented Magazine has "increased capacity with a width dimension identical to that of the prior art single stack (or slightly staggered) magazine by utilizing thinner metallic walls that correspond to the exterior dimension of the lower-capacity magazine it replaces and staggering or offsetting all of the cartridges below the upper most round without utilizing a narrowed neck region." [Doc. 47-3 at 9–10 (4:64–5:4).] Claims 5 of the '102 Patent and 12 of the '418 Patent (containing term 6 at issue) indicate that the first internal dimension between the forward wall and the rearward wall is dimensioned to fit 9x19 mm cartridges, and that the second internal dimension between the first side wall and the second opposite side wall is dimensioned to fit 9x19 mm cartridges with a staggered arrangement of the cartridges. [*Id.* at 10 (6:36–46); Doc. 47-4 at 11 (7:42–8:4).] Claim 10 of the '419 Patent (containing terms 10 and 11) includes similar language but removes reference to the 9x19 mm cartridges and instead provides that the dimensions are dimensioned to fit a "selected caliber of cartridge." [Doc. 47-5 at 11 (7:15–21).]

The Court agrees with Palmetto that the specification does not provide guidance on the extent to which the cartridges are staggered, where along the height of the magazine the width should be measured, or what caliber cartridge should be used. Moreover, there is no information in the claims regarding the process for dimensioning the magazine interior to fit cartridges in a staggered arrangement, even though the width needed to accommodate a staggered arrangement of cartridges will depend on the amount of stagger

present in the cartridges.  Additionally, the language in terms 10 and 11 providing that the internal dimensions depend on a "selected caliber of cartridge" creates more indefiniteness, as a manufacturer's ability to subjectively select the caliber of cartridge means that the claimed second internal dimension will vary depending on the manufacturer's selection. *See, e.g., Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371–74 (Fed. Cir. 2014) (holding that a claim was invalid for indefiniteness due to the "lack of objective boundaries in the claim language" and the lack of "sufficient guidance . . . in the written description of the asserted patents").

Further, as discussed earlier, the Examiner concluded during prosecution of the '102 Patent that "there are numerous firearms having a wide variety of magazines" and that consequently, a POSA "could not make [] comparisons without first knowing the dimensions of the existing magazine."  [Doc. 47-6 at 49.]  He further stated that "the specific type of firearm and cartridge size must be provided in the claim, and dependent upon the firearm and cartridge size, basic information for the OEM magazine must be indicated to provide [] clear metes and bounds for the claim."  [*Id*. at 50.]  In response to the Examiner's conclusions, it appears that Shield included information on the increase in ammunition capacity but did not specifically identify the type of OEM magazine to be replaced.  [*See id*. at 32.]  The Court concludes that this is insufficient to inform a POSA of the metes and bounds of the internal/interior dimensions of the Patented Magazine.

Considering this evidence, the Court concludes that the terms at issue are indefinite. The Asserted Patents fail to provide an objective standard by which to define the scope of either the first or second internal dimensions, and the determination of whether a given magazine is within the scope of the claims would vary depending on a number of unknown

variables.  Additionally, a first interior dimension proportioned to fit a "selected caliber of cartridge" is clearly subjective and would depend on actions of a manufacturer of which the POSA would not have clear notice.  *See DDR Holdings, LLC v. Hotels.com*, *LP*, 773 F.3d 1245, 1260 (Fed. Cir. 2014) ("When a claim term depends solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention, without sufficient guidance in the specification to provide objective direction to one of skill in the art, the term is indefinite." (cleaned up)).    Accordingly, the Court concludes that these claim terms are indefinite.

**Agreed Upon Constructions**

The parties have stipulated to constructions of the following terms: "9x19 mm cartridges," "removably retaining," and "a surface that faces downwardly." [*See* Doc. 63 at 2.]  The parties agree that these claim terms should be given their plain and ordinary meaning.  After review, the Court adopts the parties' proposed constructions.

## <u>CONCLUSION</u>

These claim constructions shall govern in this case.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

July 25, 2025
Columbia, South Carolina